**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| GARY THOMAS CARONE Derivatively on Behalf of THE SCOTTS MIRACLE-GRO COMPANY, an Ohio corporation,<br><br>          Plaintiff,<br>     v.<br><br>JAMES HAGEDORN, CHRISTOPHER J. HAGEDORN, MATTHEW E. GARTH, DAVID C. EVANS, CORY J. MILLER, BRIAN D. FINN, ADAM HANFT, STEPHEN L. JOHNSON, THOMAS N. KELLY JR., KATHERINE HAGEDORN LITTLEFIELD, BRIAN E. SANDOVAL, PETER E. SHUMLIN, JOHN RANDOLPH VINES, NANCY G. MISTRETTA, and GERALD VOLAS,<br><br>          Defendants,<br>     -and-<br><br>THE SCOTTS MIRACLE-GRO COMPANY,<br><br>          Nominal Defendant. | Case No. 2:24-cv-4180<br><br><br>**VERIFIED STOCKHOLDER**<br>**DERIVATIVE COMPLAINT**<br><br><br>**Demand for jury trial endorsed** |

Plaintiff Gary Thomas Carone ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant The Scotts Miracle-Gro Company ("**Scotts**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint against Defendants James Hagedorn, Christopher J. Hagedorn, Matthew E. Garth, David C. Evans, Cory J. Miller, Brian D. Finn, Adam Hanft, Stephen L Johnson, Thomas N. Kelly Jr., Katherine Hagedorn Littlefield, Brian E. Sandoval, Peter E. Shumlin, John Randolph Vines, Nancy G. Mistretta, and Gerald Volas (collectively, "**Defendants**") for their breaches of fiduciary duties as officers and/or directors of Scotts, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief,

except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Scotts is an Ohio company based in Marysville, Ohio. Scotts is one of the largest marketers of branded consumer products for lawn and garden care. The Company's main brands are Scotts, Miracle-Gro, and Ortho. The Company sells most of its products through third-party distributors. Scotts is the exclusive agent of Monsanto for distributions of its consumer Roundup products. In 2014, Scotts formed a wholly owned subsidiary, The Hawthorne Gardening Company ("**Hawthorne**"), which focuses on hydroponics for the emerging cannabis growing market. Throughout the period from November 3, 2021 through the present (the "**Relevant Period**"), the Company divided financial results into three segments: U.S. Consumer, Hawthorne, and Other. The U.S. Consumer and Hawthorne segments generated more than 90% of the Company's reported Relevant Period revenue.

2.      Before the start of the Relevant Period, in 2020 and 2021, Scotts experienced rising demand for its products as a result of the COVID-19 pandemic. At the time, the Company lacked sufficient inventory to meet demand and missed out on millions of dollars in sales. To keep up with demand, Scotts significantly increased its inventory for both its U.S. Consumer and Hawthorne segments, to "ensure [it] could service the needs of [its] retail partners." However, the Company promptly realized that it had purchased more inventory than consumers demanded. Rather than write down the excess inventory or disclose the issue to investors, Defendants instead

engaged in a scheme to saturate Scotts' sales channels with more inventory than could be sold to consumers. Through this scheme, Scotts booked the sales to its distributors as revenue. Those revenues enabled the Company, which was highly leveraged, to maintain debt-to-earnings ratios at levels barely exceeding those required by the Company's debt covenants.

3.  Specifically, leading up to the Relevant Period, Scotts had entered into senior secured credit facilities containing various restrictive covenants and cross-default provisions requiring that the Company maintain certain financial ratios. For example, a key covenant required Scotts to maintain a debt-to-earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") ratio of less than 6.25. Any breaches of these covenants could result in a default, enabling Scotts' lenders to declare all outstanding indebtedness immediately due and payable. This dynamic created an incentive for the Company to saturate its sales channels with inventory to avoid breaching its debt covenants. Indeed, at the beginning of the Relevant Period, Scotts held $2.3 billion debt which ballooned to nearly $3.1 billion of debt by the end of the Relevant Period.

4.  After the close of markets on June 1, 2021, Scotts announced that it had increased sales and earnings guidance for 2021 "based on the continued strength of both its U.S. Consumer and Hawthorne segments." A few months later, during the Company's earnings call for the fiscal third quarter of 2021, Defendants highlighted that Scotts had a "good line of sight [on inventory levels], which gives us a high degree of confidence in our guidance [.]"[1]

5.  Throughout the Relevant Period, Scotts repeatedly assured investors that its inventory levels were appropriate, that it was experiencing peak or record sales periods, and that the Company was going to stay in compliance with its debt covenants. Indeed, after multiple months of saturating the sales channel, Defendants continued to assure investors that channel

---

[1] Scotts reports financial results based on a fiscal year ending on September 30.

inventories were not a problem, For example, during the Company's earnings call for the fiscal fourth quarter of 2021, Defendants assured investors: "[A]s it relates to inventory, we find ourselves in a very good place right now." Similarly, during the Company's earnings call for the fiscal first quarter of 2023 on February 1, 2023, Defendants maintained that the Company "[didn't] have [an] inventory problem at all." Scotts further attributed its strong sales to "selling through high-cost inventory," which yielded "peak selling" and "record shipments."

6. Regarding its debt covenants, during the Relevant Period, Scotts touted that the Company had topped its internal targets for results and had "net leverage of 5.9 times debt-to-EBITDA comfortably within covenant maximum of 6.25 times." The Company also stated that it was "optimistic we will remain within the bounds of our bank covenants" and did "not see leverage compliance issues going forward." The Company also claimed that it was "tracking to do even better" than its guidance, which was "really, really important to [Scotts] to avoid covenant hell."

7. These statements, and similar statements made by Defendants during the Relevant Period, were materially false or misleading because, in reality, Scotts was pushing products through its sales channels at a pace that outstripped demand. As the Company recognized that its supply of inventory far exceeded consumer needs, Defendants engaged in a scheme to saturate the Company's sales-channel with more products than those retailers could sell through to consumers. Further, and as the Company admitted during the Relevant Period, Scotts was critically close to violating its debt covenants and would have need an "exceptional year" to remain in compliance with its covenants.

8. Scotts was only able to meet the conditions of its debt covenants through this channel-stuffing scheme. In the fourth fiscal quarter of 2022, Scotts even changed its approach toward calculating Adjusted EBITDA – the main metric used to calculate the Company's

compliance with its debt covenants – in order to stay within the bounds of its debt covenants. As a result of these misrepresentations, Scotts common stock traded at artificially inflated prices throughout the Relevant Period.

9.      The truth began to emerge on June 8, 2022, when Scotts issued a press release disclosing that replenishment orders from U.S. retailers were more than $300 million below target in the month of May alone. As a result, Defendants revealed to investors that the Company was forced to cut its guidance by nearly 50% for 2022 full-year earnings per share and planned to take on additional debt to cover restructuring charges as it attempted to cut costs.

10.     This news shocked the market, as the dramatic cut to guidance came just weeks after the Company promised that it was "tracking to do even better" than its guidance. Indeed, analysts at Truist reported, "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]."

11.     In reaction to this news, the price of Scotts common stock declined by $9.05 per share, or nearly 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022.

12.     Throughout the Relevant Period, the Individual Defendant continued to mislead the market by downplaying the Company's excess inventory and debt covenants compliance issues.

13.     The full truth was disclosed before the markets opened on August 2, 2023, when Scotts issued a press release revealing that quarterly sales for the fiscal third quarter of 2023 had declined by 6%, and that gross margins had fallen by 420 basis points. The Company also slashed its fiscal year EBITDA guidance by a staggering 25% and announced a $20 million write-down of "pandemic driven excess inventories." The Company further disclosed that it had to modify its debt covenants to 7.0 times debt-to-EBITDA ratio, from the former 6.25 times debt-to-EBITDA

ratio. As J.P. Morgan analysts reported the following day, in conjunction with the modification, Scotts had to "downsize[] its credit facility by $250 [million]."

14.     Analysts were against surprised by the "historic cut to [earnings per share]," as Wells Fargo proclaimed that the "historic cut" was a "[t]otal earnings destruction[,]" leading to "one of the worst years on record" for Scotts.

15.     On this news, the price of Scotts common stock fell $13.58 per share, or 19% from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023.

16.     As detailed herein, and as alleged in the ongoing federal securities class actions in the Southern District of Ohio, Eastern Division styled *City of Inkster Policemen and Firemen Retirement System v. The Scotts Miracle-Gro Company et al*., Case 2:24-cv-03766-EAS-CMV, and the Southern District of Ohio, Eastern Division styled *City of Hialeah Employees' Retirement System v. The Scotts Miracle-Gro Company et al.*, Case 2:24-cv-03132-ALM-CMV (the "**Securities Class Actions**"), Scotts' officers and directors substantially damaged the Company by filing false and misleading statements and omissions in violation of federal law. Defendants have also substantially damaged Scotts' reputation, goodwill and standing in the business community; exposed Scotts to substantial potential liability in the Securities Class Actions as well as the costs associated with defending itself, and millions of dollars in lost market capitalization.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

19.     This court has personal jurisdiction over each defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

20.     Venue is proper in this District because the Company has its principal place of business in this District, Defendants have been involved in business in this District, and their actions have had a substantial effect in this District.

## THE PARTIES

**Plaintiff**

21.     Plaintiff Gary Thomas Carone is and has continuously been a stockholder of Scotts during the wrongdoing complained of herein.

**Nominal Defendant**

22.     Nominal Defendant Scotts is an Ohio corporation with its principal executive offices located at 14111 Scottslawn Road, Marysville Ohio. The Company's common stock trade on the New York Stock Exchange ("**NYSE**") under the ticker symbol "SMG."

**Individual Defendants**

23.     Defendant James Hagedorn ("**Hagedorn Senior**") served as Scotts CEO and Chairman of the Board since May 2001 and January 2003, respectively. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Hagedorn Senior received $11,994,566 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Hagedorn Senior received $8,169,861 in compensation. According to the Company's Proxy

7

Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Hagedorn Senior received $10,713,912 in compensation.

24. Defendant David C. Evans ("**Evans**") served as a Company director since 2018. Defendant Evans is Chair of the Audit Committee and is a member of the Finance Committee. Defendant Evans previously served as the Company's Executive Vice President and Interim CFO from August 2022 until November 2022. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Evans received $325,049 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Evans received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Evans received $285,203 in compensation.

25. Defendant Adam Hanft ("**Hanft**") served as a Company director since 2010. Defendant Hanft is a member of the Finance Committee and the Innovation and Technology Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Hanft received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Hanft received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Hanft received $285,203 in compensation.

26. Defendant Stephen L. Johnson ("**Johnson**") served as a Company director since 2010. Defendant Johnson is Chair of the Nominating and Governance Committee and is a member of both the Compensation and Organization Committee and the Innovation and Technology Committee. According to the Company's Proxy Statement filed with the SEC on December 13,

2023, for the 2023 fiscal year, Defendant Johnson received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Johnson received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Johnson received $285,203 in compensation.

27. Defendant Thomas N. Kelly Jr. ("**Kelly**") served as a Company director since 2006. Defendant Kelly is Chair of the Innovation and Technology Committee and is a member of both the Compensation and Organization Committee and the Finance Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Kelly received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Kelly received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Kelly received $285,203 in compensation.

28. Defendant Katherine Hagedorn Littlefield ("**Littlefield**") is the sister of Defendant Hagedorn Senior. Defendant Littlefield served as a Company director since 2000 and has served as Vice Chair since 2013. Defendant Littlefield is Chair of the Finance Committee, and is also a member of the Innovation and Technology Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Littlefield received $28,750 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Littlefield received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Littlefield received $285,203 in compensation.

29.     Defendant Brian E. Sandoval ("**Sandoval**") served as a Company director since 2022. Defendant Sandoval is Chair of the Compensation and Organization Committee and is a member of the Nominating and Governance Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Sandoval received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Sandoval received $160,839 in compensation.

30.     Defendant Peter E. Shumlin ("**Shumlin**") served as a Company director since 2017. Defendant Shumlin is a member of the Nominating and Governance Committee and the Compensation and Organization Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Shumlin received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Shumlin received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Shumlin received $285,203 in compensation.

31.     Defendant John Randolph Vines ("**Vines**") served as a Company director since 2013. Defendant Vines is a member of the Nominating and Governance Committee and is a member of the Innovation and Technology Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Vines received $407,733 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Vines received $371,262 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Vines received $335,209 in compensation.

32.     Defendant Nancy C. Mistretta ("**Mistretta**") served as a Company director from January 2007 until January 30, 2024. Defendant Mistretta was a member of the Audit Committee and the Compensation and Organization Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Mistretta received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Mistretta received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Mistretta received $285,203 in compensation.

33.     Defendant Gerald Volas ("**Volas**") served as a Company director from August 3, 2021, until July 11, 2023. Defendant Volas is a member of the Audit Committee and the Finance Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Volas received $353,799 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Volas received $321,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Volas received $93,822 in compensation.

34.     Defendant Brian D. Finn ("**Finn**") served as a Company director from 2014 until November 7, 2022. Defendant Finn was a member of the Finance Committee. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Finn received $28,750 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Finn received $312,317 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Finn received $285,203 in compensation.

35.     Defendant Christopher J. Hagedorn ("**Hagedorn Junior**") is Defendant Hagedorn Senior's son. Since 2021, Defendant Hagedorn Junior has been employed by The Hawthorne Gardening Company, a subsidiary of the Company, as Division President. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Hagedorn Junior received $1,577,672 in compensation. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Hagedorn Junior received $1,622,953 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Hagedorn Junior received $2,661,917 in compensation.

36.     Defendant Matthew E. Garth ("**Garth**") served as the Company's CFO, Chief Administrative Officer, and Executive VP since December 2022. According to the Company's Proxy Statement filed with the SEC on December 13, 2023, for the 2023 fiscal year, Defendant Garth received $5,652,601 in compensation.

37.     Defendant Cory J. Miller ("**Miller**") served as the Company's Executive Vice President and CFO from January 2021 to August 2022 and Hawthorne's Vice President of Finance from 2016 to 2020. According to the Company's Proxy Statement filed with the SEC on December 14, 2022, for the 2022 fiscal year, Defendant Miller received $1,890,649 in compensation. According to the Company's Proxy Statement filed with the SEC on December 15, 2021, for the 2021 fiscal year, Defendant Miller received $2,908,890 in compensation.

**Relevant Non-Parties**

38.     Non-Party Edith Aviles ("**Aviles**") served as a Company director since January 2023. Non-Party Aviles was a member of the Audit Committee and a member of the Finance Committee.

39.     Non-Party Mark D. Kingdon ("**Kingdon**") served as a Company director since July 2023. Non-Party Kingdon is a member of the Audit Committee, the Compensation and Organization Committee, and the Finance Committee.

40.     Because of their positions with Scotts, Defendants possessed the power and authority to control the contents of Scotts' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information ("**MNPI**"), each of the Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

**Background**

41.     Scotts is one of the world's largest marketers of branded consumer products for lawn and garden care. Its revenue is mostly generated from the U.S. Consumer and Hawthorne business segments, and most of its products are sold through third-party distributors. After missing out on pandemic-induced sales opportunities in 2020 and 2021 due to shortage of inventory, the Company significantly increased its inventory for both its U.S. Consumer and Hawthorne segments.

42.     However, the Company quickly realized that it had purchased too much inventory. Rather than write down the inventory or otherwise disclose the issue to investors, Defendants engaged in a scheme to saturate the Company's sales channels with more inventory than could be sold to consumers, enabling Scotts to book the sales to its distributors as revenue. As Scotts was

highly leveraged with its credit facilities containing restrictive debt covenants, Defendants' scheme allowed the Company to maintain debt-to-earnings ratios that just barely exceeded those required by its debt covenants to stay in compliance and avoid a default.

43.    Indeed, the EBITDA calculations offered to investors by Scotts were tied to the Company's debt covenants. As explained in Scotts' press releases throughout the Relevant Period, the "presentation of Adjusted EBITDA is intended to be consistent with the calculation of that measure as required by the Company's borrowing arrangements, and used to calculate a leverage ratio."

**The Individual Defendants' False and Misleading Statements**

44.    The Relevant Period begins on June 2, 2021. After the close of the markets on June 1, 2021, Scotts issued a press release announcing that it had "increased sales and earnings guidance for fiscal 2021 based on the continued strength of both its U.S. Consumer and Hawthorne segments" and that the Company now expected "company-wide sales growth of 17 to 19 percent." The following day, during the William Blair & Company 41st Annual Growth Stock Conference on June 2, 2021, Defendant Miller provided additional commentary on the increased guidance and reiterated that, despite prior seasonality issues, "we're still raising our guidance… on sales in both the U.S. Consumer business and Hawthorne." Defendant Miller then explained that the Company "now expect[s] growth of 7% to 9% in the U.S. Consumer business versus a previous guidance range of 4% to 6%. For Hawthorne, Defendant Miller highlighted that Scotts "now expect[s] growth of 40% to 45% versus a previous range of 30% to 40%."

45.    On August 4, 2021, Scotts issued a press release announcing its financial results for its fiscal third quarter of 2021, which ended on July 3, 2021. During the accompanying earnings conference call, Defendant Miller reported that for the U.S. Consumer business, Scotts has been

14

replenishing "categories to keep the stores at the right level of inventory[,]" emphasizing that Scotta has a "good line of sight here, which gives us a high degree of confidence in our guidance[.]"

46.     On November 3, 2021, Scotts issued a press release announcing its financial results for the fourth fiscal quarter and full year of 2021, which ended on September 30, 2021. Therein, Scotts reported Adjusted EBITDA for full year 2021 of $902.6 million, an increase from the $776.6 million of Adjusted EBITDA the Company had reported for full fiscal year 2020. The same press release highlighted that Scotts' "leverage ratio at the end of the quarter was approximately 2.7 times average debt-to-EBITDA."

47.     During the accompanying earnings conference all held later that day, Defendant Hagedorn Senior claimed: "[W]e see a higher level of sustainable growth with our existing brands… based largely on our ability to reach a new generation of consumers." Defendant Hagedorn Senior also emphasized that the Company "just finished [its] third straight record year and remain[s] extremely optimistic[,]" stating that "every cut of the data tells us [consumers] have stayed with the category and our brands throughout this past season." Also on the call, Defendant Miller added that "as it relates to inventory, we find ourselves in a very good place right now."

48.     On February 1, 2022, Scotts issued a press release announcing its financial results for the first fiscal quarter of 2022. Therein, the Company announced that it was increasing its full-year U.S. Consumer segment sales guidance due to "better-than-expected results in the U.S. Consumer, coupled with the additional pricing actions that will take effect in the third quarter."

49.     During the corresponding call with investors that day, Defendant Miller reported the Company's leverage ratio was at "3.3 times at the end of Q1." During the question-and-answer portion of the call, William Blair analyst Jon Andersen noted that Scotts had "taken your numbers up" for the U.S. Consumer segment, suggesting a "certain degree of confidence." The analyst then

inquired whether the confidence was coming from "some real time data." In response, Defendant Hagedorn Senior highlighted the "POS [(point of sale)] data, for sure is good" before noting that the Company realized a "much earlier and successful kind of load into retail."

50.     On May 3, 2022, Scotts issued a press release announcing its financial results for the second fiscal quarter of 2022, which ended on April 2, 2022. The press release reported Scotts' Adjusted EBITDA for the quarter as $429.6 million. During the accompanying earnings conference call held that same day, Defendant Miller noted that the Company's "leverage ratio" now stood at "3.8 times" Adjusted EBITDA.

51.     During the same call, Defendant Hagedorn Senior explained that "the lack of capacity in the short term meant we also had to build and hold more inventory to ensure we could service the needs of our retail partners." However, Defendant Hagedorn Senior assured investors that the Company was "tracking to do even better," noting that weather was the Company's "biggest challenge" when it came to moving through inventory. Additionally, Defendant Hagedorn Junior later claimed on the call that although inventories were high, "peak selling is happening now."

52.     On June 8, 2022, the truth began to emerge when Scotts issued a press release admitting that replenishment orders from its U.S. retailers in the U.S. Consumer segment were more than $300 million below the Company's target in the month of May alone. Describing the sales decline as a "trend," the press release noted the sales miss "put significantly greater pressure on our fixed cost structure." The press release further revealed the Company was slashing its 2022 fiscal year sales guidance, with Scotts now expecting U.S. Consumer sales to decline 4% to 6% and with Hawthorne sales also expected to decline 40% to 45% for the 2022 fiscal year. The Company also announced plans to take on additional debt to cover restructuring charges as it

attempted to cut costs. Nevertheless, Defendants continued to mislead investors about Scotts' inventory levels by claiming in the same press release that "[i]f the Company underestimates or overestimates demand for its products and does not maintain appropriate inventory levels, [the Company's] net sales and/or working capital could be negatively impacted."

53.     Analysts were shocked by the Company's disclosures, as reflected in a report by Truist proclaiming that, "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]." As a result of this news, the price of Scotts common stock shares declined by $9.05 share, or nearly 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022, on extraordinary trading volume.

54.     Despite these revelations, Defendants continued to mislead investors by downplaying the Company's inventory and debt covenant issues. Unbeknownst to investors, at this time, the Company had already overpurchased inventory that it was not able to sell and was burdened with debt covenants that it was on the verge of breaching.

55.     On August 3, 2022, Scotts issued a press release announcing its financial results for the third fiscal quarter of 2022, which ended on July 2, 2022. The press release reported Scotts' Adjusted EBITDA for the quarter was $209.6 million, well below the $357.1 million Adjusted EBITDA the Company reported in the same period in the prior year. The press release further noted that the "Company's debt-to-EBITDA ration at the end of the quarter was 5.1 times." Nevertheless, Defendant CFO Miller was quoted in the press release, stating that the "recent amendment to our credit facility provides flexibility up to 6.5 time[s] debt-to-EBITDA" and that "we are taking aggressive steps to reduce our leverage as quickly as possible."

56.     During the accompanying conference call that day, Defendant Miller assured investors, "[W]e would expect leverage to peak in the March quarter at approximately 6 times."

Defendant Miller further assured investors that "given the recent amendments to our credit facility, we are comfortable we have the room to navigate." Finally, Defendant Miller explained to investors that a "good portion" of the Company's higher reported inventory levels were due "to every unit just costing more with cost increases."

57. On November 2, 2022, Scotts issued a press release announcing its financial results for the fourth fiscal quarter and full year 2022, which ended on September 30, 2022. Therein, the Company reported that its "debt-to-EBITDA ratio at the end of the quarter was 6.0 times." In addition, the Company announced a change to the manner in which it calculated relevant financial metrics:

> Beginning with the three months ended September 30, 2022, equity in income / loss of unconsolidated affiliates is excluded from the calculation of non-GAAP Adjusted EBITDA. This exclusion is consistent with the calculation of that measure as required by the Company's borrowing arrangements. This change has been reflected in the calculation of Adjusted EBITDA for the three and twelve months ended September 30, 2022. The prior period amounts have not been reclassified to conform to the revised calculation.

58. On that same day, during the accompanying earnings call, an analyst asked about the Company's EBITDA growth and how Scotts was going to sustain its leverage ratio compliance. In response, Defendant Evans stated, "I can just tell you that the EBITDA growth that we have built in our plan is, today, I mean, we're not presenting a plan that says we're going to be in default. I mean, we're presenting a plan that says we will be in compliance." On the same call, Defendant Hagedorn Senior claimed, "I'm optimistic we will remain within the bounds of our bank covenants."

59. On February 1, 2023, Scotts issued a press release announcing its financial results for the first fiscal quarter of 2023, which ended on December 31, 2022. Therein, the Company

reported Adjusted EBITDA of $21.2 million and that its "average debt-to-EBITDA ratio at the end of the quarter was 5.9 times, within the covenant maximum of 6.25 times."

60.     During the accompanying earnings conference call held later that day, Defendant Hagedorn Senior compared the Company's financial performance to its internal projections, highlighting, "[n]et sales that beat the plan by nearly $25 million; gross margin improvement of almost 300 basis points against our plan; EBITDA of $21 million against an internal forecast of zero; net leverage of 5.9 times debt-to-EBITDA comfortably within the covenant maximum of 6.25 times." Later on the call, Defendant Hagedorn Senior claimed, "I don't think we have a[n] inventory problem at all[,]" while Defendant Garth touted that Scotts had "record December shipments."

61.     On March 6, 2023, during the Raymond James Institutional Investors Conference, Defendant Garth represented to investors that the "[f]irst quarter proved that we were able to stay within our covenant 5.9 times against the 6.25 covenant[,]" before repeating that Scotts had experienced "record December shipments."

62.     On May 3, 2023, Scotts issued a press release announcing its financial results for the second fiscal quarter of 2023, which ended on April 1, 2023. The Company reported Adjusted EBITDA for the quarter of $04,8 million and that "the Company's average net debt-to-EBITDA ratio at the end of the quarter was 6.0 times versus the covenant maximum of 6.5 times."

63.     During the accompanying earnings conference call held later that day, Defendant Garth reported "lower shipment volumes… related to our expectation for reduced retail inventory levels which are down 6% in units versus the prior year." Defendant Garth further claimed that Scotts "pulled back on production volumes and we are selling through higher cost inventory." On the same call, Defendant Hagedorn Senior stated that the Company was "living within [its] credit

facility covenants" and "do[es] not see leverage compliance issues going forward as [it's] looking at the low-5 times range by fiscal year end." Defendant Hagedorn Senior also touted that the "team on consumer has just really killed it," which was "really, really important for us to avoid covenant hell" in the first half of the year.

64.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Scotts had an oversupply of inventory that far exceeded consumer demand prior to the start of the Relevant Period; (2) Defendants engaged in a channel-stuffing scheme to saturate the Company's sales channel with more product than those retailers could sell through to consumers; (3) Scotts was only able to satisfy its debt covenants through its channel-stuffing scheme; and (4) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Fully Emerges**

65.     The truth was fully revealed before the markets opened on August 2, 2023, when Scotts issued a press release announcing its financial results for the third fiscal quarter of 2023, which ended on July 1, 2023. In the press release, Scotts disclosed that it had amended its debt covenants, including an increased debt-to-earnings ratio. For example, the Company revealed that it had to modify its debt covenants to permit a 7.00 times debt-to-EBTIDA ratio, from the original covenant that only permitted 6.25 times debt-to-EBITDA ratio.

66.     That same day, during the accompanying earnings conference call, Defendants revealed that quarterly sales for the quarter had declined by 6%, and gross margins had fallen by

420 basis points. The Company also again slashed the 2023 fiscal year guidance by a staggering 25% and announced it had to take a $20 million write down for "pandemic driven excess inventories."

67.     Analysts were once again shocked by these revelations. Analysts at Wells Fargo called the news a "[t]otal earnings destruction" and "one of the worst years on record with [Scotts issuing a [2023 fiscal year] guidance implying [earnings per share ("EPS")] below $1/[share]." In another report, the same analysts called this "historic cut to EPS… eye-popping to us[,]" noting that "several decades of earnings [are] gone (one will be hard-pressed to find any year below $2 let alone $1)."

68.     As a result of this news, the price of Scotts common stock dropped another $13.58 per share, or 19%, from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023, on extraordinary trading volume.

**The Insider Selling Defendants Sold Over $50 Million of Scotts Stock at Artificially Inflated Prices While in Possession of Adverse MNPI**

69.     Prior to the truth being revealed to the market, Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson (the "**Insider Selling Defendants**") collectively dumped over $50 million worth of their Scotts stock at artificially inflated prices. By virtue of their high-level positions as officers and directors of the Company and/or their status as dual fiduciaries of the Company, the Insider Selling Defendants possessed adverse MNPI that they knew was not yet disclosed to the public, namely that Scotts intentionally engaged in unscrupulous channel-stuffing practices to saturate the Company's sales channel with more product than those retailers could sell through to consumers to satisfy its debt covenants.

70.     Defendant Hagedorn Senior made the following sales of Scotts stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $57.86 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 1/31/2022 | 191,153 | $151.20 | $28,902,33.60 | $11,060,112.58 | $17,842,221.02 |
| 2/4/2022 | 14,628 | $132.87 | $1,943,622.36 | $846,376.08 | $1,097,246.28 |
| 5/13/2022 | 27,611 | $98.53 | $2,720,589.14 | $1,597,572.46 | $1,123,016.68 |
| 5/13/2022 | 10,138 | $97.53 | $988,779.42 | $586,584.68 | $402,194.74 |
| 5/13/2022 | 22,251 | $96.84 | $2,154,851.37 | $1,287,442.86 | $867,408.51 |
| 1/17/2023 | 31,077 | $61.09 | $1,898,465.96 | $1,798,115.22 | $100,350.74 |
| 1/17/2023 | 18,923 | $60.25 | $1,140,097.50 | $1,094,884.78 | $45,212.72 |
| 2/3/2023 | 7,702 | $82.27 | $633,643.54 | $445,637.72 | $188,005.82 |
| 5/12/2023 | 14,838 | $67.36 | $999,509.54 | $858,526.68 | $140,983.26 |
| 5/12/2023 | 10,162 | $66.46 | $675,399.04 | $587,973.32 | $87,425.72 |
| | | **Totals:** | **$42,057,291.86** | | **$21,894,065.48** |

71.     These sales amount to over **58 times** Defendant Hagedorn Senior's $720,000 salary, and nearly **3.5 times** his total compensation from the Company for the 2023 fiscal year. By selling his stock before the MNPI was disclosed to the public, Defendant Hagedorn Senior also avoided losses of over $21.8 million.

72.     Defendant Littlefield, though her affiliation with the Hagedorn Partnership, made the following sales of Scotts stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $57.86 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 11/21/2022 | 17,965 | $58.00 | $1,041,970.00 | $1,039,454.90 | $2,515.10 |
| 11/22/2022 | 12,277 | $57.92 | $711,083.84 | $710,347.22 | $736.62 |
| 2/7/2023 | 31,400 | $80.51 | $2,528,014.00 | $1,816,804.00 | $711,210.00 |
| 2/7/2023 | 18,600 | $81.21 | $1,510,506.00 | $1,076,196.00 | $434,310.00 |
| 2/9/2023 | 11,682 | $80.48 | $940,167.36 | $675,920.52 | $264,246.84 |
| 2/9/2023 | 11,318 | $79.82 | $903,402.76 | $654,859.48 | $248,543.28 |
| | | **Totals:** | **$7,635,143.96** | | **$1,661,561.84** |

73.     These sales amount to nearly **265 times** her total compensation from the Company for the 2023 fiscal year. By selling her stock before the MNPI was disclosed to the public, Defendant Littlefield also avoided losses of over $1.66 million.

74.     Defendant Hagedorn Junior made the following sales of Scotts stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $57.86 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 2/4/2022 | 5,745 | $132.87 | $763,338.15 | $332,405.70 | $430,932.45 |
| 2/3/2023 | 2,256 | $82.27 | $185,601.12 | $130,532.16 | $55,068.96 |
| | | Totals: | $948,939.27 | | $486,001.41 |

75.     These sales amount to **1.58 times** Defendant Hagedorn Junior's $599,833 2022 salary, and nearly 58% of his total compensation from the Company for the 2022 fiscal year. By selling his stock before the MNPI was disclosed to the public, Defendant Hagedorn Junior also avoided losses of approximately $486,001.41.

76.     Defendant Johnson made the following sales of Scotts stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $57.86 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 5/4/2022 | 305 | $113.98 | $34,763.90 | $17,647.30 | $21,140.35 |
| 5/4/2022 | 2,000 | $113.26 | $226,526.20 | $115,720.00 | $110,806.20 |
| 2/7/2023 | 935 | $80.47 | $75,239.45 | $54,099.10 | $21,140.35 |
| | | Totals: | $336,529.55 | | $149,063.15 |

77.     These sales amount to over **11 times** Defendant Johnson's $28,750 director's fee, and nearly 95% of his total compensation from the Company for the 2023 fiscal year. By selling his stock before the MNPI was disclosed to the public, Defendant Johnson also avoided losses of approximately $149,063.15.

## FIDUCIARY DUTIES

78.     By reason of their positions as officers and directors of the Company, each of the Defendants owed and continues to owe Scotts and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Scotts in a fair, just, honest, and equitable manner. Defendants were at all times required to act in furtherance of the best interests of Scotts and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

23

79.     Each Defendant owed Scotts, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of the obligations as directors and/or officers of Scotts, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company.

80.     Defendants, because of their positions of control and authority as directors and/or officers of Scotts, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their positions with Scotts, each of the Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

81.     To discharge their duties, Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC, and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest and, prudent manner in accordance with the laws and regulations of Ohio and the United States and pursuant to Scotts' own Code of Business Conduct and Ethics.

(c)     Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how Scotts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Scotts, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequately functioning system of internal legal, financial, and management controls such that Scotts' operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subject and duties set forth above; and

(i)       Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

82.    Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, commit the wrongdoing complained of herein with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Scotts and at all times acted within the course and scope of such agency.

**Duties Pursuant to the Company's Code of Business Conduct**

84.    The Individual Defendants, as officers and/or directors of Scotts, were bound by the Company's Code of Business Conduct and Ethics (the "**Code of Conduct**"), [2] which states in relevant part:

> We stand with our consumers, helping them enjoy the benefits of their lawns and gardens.
>
> We stand together as Associates to grow our business, protect the legacy of our Company and create a respectful and collaborative workplace, regardless of race, religion, national origin, sexual orientation or gender identity or expression.

---

[2] *See* The ScottsMiracle-Gro Company's Code of Business Conduct & Ethics:
https://scottsmiraclegro.gcs-web.com/static-files/98d1b5f7-fe51-4e66-9796-730f0e76b637.

We stand with our suppliers and retail partners, dealing fairly with them, listening carefully to their needs and supporting their business.

We stand for our shareholders by striving to enhance the value of their investment.

We stand for an ethical, competitive marketplace.

We stand for doing the right things in the countries and communities where we live and work.

85.    A section of the Code of Conduct titled "Why We Have a Code" states:

At ScottsMiracle-Gro, we adhere to the highest standards of personal, professional and business ethics. This Code of Business Conduct and Ethics delivers behavioral guidance to help us conduct our business with honesty, integrity and professionalism.

This Code is intended as an overview of the Company's values, which underlie our policies. For more information about the values described here, read our policies on The Garden, the associate intranet site. Understand, however, that this Code and our policies cannot and are not intended to provide answers to all questions. For that, we must rely, ultimately, on each person's sense of doing what's right, including knowing when to seek guidance from others on the appropriate course of action.

This Code establishes guidelines for ethical as well as legal behavior and anticipates that each of us will take responsibility for our own conduct.

86.    Under the "Why We Have a Code" section of the Code of Conduct, a subsection

titled "Who Must Follow the Code" states in relevant part:

This Code applies to every ScottsMiracle-Gro associate, officer and member of our Board of Directors. Each of us is obligated to read and understand this Code and to integrate its standards into every aspect of our business. Each of us must follow these standards as we do our jobs.

If you have questions, ask them. If you have ethical concerns, raise them. If you are unsure about how the Code applies to a particular situation, ask before you act.

87.     Under the "Why We Have a Code" section of the Code of Conduct, a subsection

titled "What is Expected of Leaders" states in relevant part:

> Leaders at our Company have a special responsibility to
> demonstrate our values through their actions. They should hold
> themselves to the highest standards of ethical conduct and foster an
> environment of integrity, honesty and respect. They should
> encourage others to act with integrity to avoid even the appearance
> of a violation of our guiding principles. Leaders must never retaliate
> against anyone for raising an ethics issue, assisting in an
> investigation, or participating in any proceeding relating to an
> alleged violation of this Code or any law or regulation.
>
> Leaders, if you are approached by an associate with a question or
> concern, listen carefully and given the associate your complete
> attention. Ask for clarification and additional information to make
> sure you understand the issue being raised. Demonstrate our guiding

88.     Under the "We Stand Together As Scotts Associates" section of the Code of

Conduct, a subsection titled "Conflicts of Interest" states in relevant part:

> We do not take advantage of an opportunity that belongs to the
> Company for our own personal gain. We appreciate that
> opportunities that we discover through our work here or as a result
> of Company property or information belong to ScottsMiracle-Gro.
> We do not engage in activities that create, or even appear to create,
> conflict between our personal interests and the interests of
> ScottsMiracle-Gro. For example, it would create at least the
> appearance of a conflict of interest for you or a member of your
> family to participate in a business arrangement or investment
> involving ScottsMiracle-Gro or that you learned of from a
> competitor, customer, client or supplier of ScottsMiracle-Gro or
> your position in the Company. You should disclose potential
> conflicts of interest immediately to your manager or supervisor and
> the Ethics Department, and take no further action until the situation
> is resolved.

89.     A section of the Code of Conduct titled "We Stand For Our Shareholders" states in

relevant part:

> We act honestly and transparently with our shareholders. We spend
> and invest their money wisely, as if it were our own. We follow the

28

letter and spirit of the law in reporting our financial performance. In so doing, we maintain the trust investors have placed in us.

90.    Under the "We Stand For Our Shareholders" section of the Code of Conduct, a

subsection titled "Corporate Governance" states in relevant part:

> We have an effective governance and compliance infrastructure that helps achieve our business objectives and create value for our shareholders. This includes the ethical behavior of our management team and our open and responsive approach to concerns raised by others. Our Board of Directors periodically reviews our key governance documents and policies. In addition, we update our Board regarding fiduciary duties and other governance matters as appropriate and invite our Board to attend numerous training opportunities each year. Our Board's Compensation Committee follows a philosophy that awards incentives to corporate officers to achieve our operational and strategic goals, which aligns our interests with those of our shareholders.

91.    Under the "We Stand For Our Shareholders" section of the Code of Conduct, a

subsection titled "Insider Trading" states in relevant part:

> We treat "inside information" appropriately and lawfully. Anyone who had material inside information about ScottsMiracle-Gro or a ScottsMiracle-Gro customer, supplier or competitor must not use it for personal gain or provide it to others.

92.    Under the "We Stand For Our Shareholders" section of the Code of Conduct, a

subsection titled "Confidentiality of Company Information" states in relevant part:

> We consider every piece of information we own as an asset, and we are careful to safeguard our confidential information. We do not reveal confidential or non-public information about the Company, our customers, suppliers, vendors or anyone else. We respond to legitimate inquiries from our stakeholders without releasing confidential information or violating securities laws.

93.    Under the "We Stand For Our Shareholders" section of the Code of Conduct, a

subsection titled "Conflicts of Interest" states in relevant part:

> We do not take advantage of an opportunity that belongs to the Company for our own personal gain. We appreciate that

29

opportunities that we discover through out work here or as a result of Company property or information belong to ScottsMiracle-Gro. We do not engage in activities that create, or even appear to create, conflict between our personal interests and the interests of ScottsMiracle-Gro.

94. Under the "We Stand For Our Shareholders" section of the Code of Conduct, a subsection titled "Accuracy in Business Records and Financial Reporting" states in relevant part:

We are committed to integrity and honesty of financial reporting to protect our financial strength and reputation. This includes not only financial accounts, but other records such as quality reports, time records, expense reports, benefits claim forms and employment applications. We do not enable another person's efforts to evade taxes or local currency laws.

95. Under the "We Stand For Doing The Right Things In The Countries & Communities Where We Live" section of the Code of Conduct, a subsection titled "Commitment to Following All Laws and Regulations" states in relevant part:

We are a highly regulated global business. We abide by the letter and spirit of all laws, rules and regulations that apply in all countries and communities where we do business. Each of us is responsible to act in a compliant way, support our compliance efforts, and seek out additional knowledge and expertise if we have questions.

**Duties Pursuant to the Audit Committee Charter**

96. In addition to the duties set forth in the Code of Conduct, Defendants Evans, Mistretta, and Volas (the "**Audit Committee Defendants**") owed specific duties to Scotts under the Company's Audit Committee Charter (the "**Audit Charter**").[3] Specifically, the Audit Charter provided in relevant part for the following responsibilities of the Audit Committee Defendants:

[A]ssisting the Board in the oversight of (i) the integrity of the Company's financial statements and financial reporting process, (ii) the Company's compliance with legal and regulatory requirements

---

[3] *See* The Scotts Miracle-Gro Company Audit Committee Charter (April 22, 2024) at: https://scottsmiraclegro.gcs-web.com/static-files/e4e564d2-b3f5-46c0-be3a-5f08c1563950.

(collectively, "Applicable Rules"), (iii) the qualification, independence and performance of the Company's independent registered public accounting firm (the "External Auditor"), (iv) the performance of the Company's internal audit function, and (v) the performance of other Committee functions as set forth in this charter.

97.    The Audit Charter outlines other additional duties and responsibilities. Under the

"Disclosure and Financial Reporting" section of the Audit Charter, the Audit Charter states that

the Audit Committee is responsible for the following:

- Review and discuss with management and the External Auditor the Company's consolidated annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under the section "Management's Discussion and Analysis of Financial Condition and Results of Operation", prior to filing with the Securities and Exchange Commission ("SEC") and recommend whether the annual audited financial statements should be included in the Company's annual report on Form 10-K.

- Review management's report on internal control over financial reporting prior to its inclusion in the annual report on Form 10-K.

- Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls, and any special audit steps adopted in light of material control deficiencies.

- Prepare the Committee report required by the proxy rules of the SEC to be included in the Company's annual proxy statement.

- Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies, prior to issuance and in accordance with Applicable Rules.

- Receive and review any disclosure from the Company's CEO and CFO made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of: (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's

ability to record, process summarize and report financial data; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- Review other relevant reports or financial information submitted by the Company to the public, the SEC, or any other governmental body that oversees financial reporting, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the independent auditor (or summaries thereof).

98. Under the "Other Matters" section of the Audit Charter, the Audit Committee is responsible for the following:

Discuss with management and the External Auditor the significant financial reporting and disclosure items emphasized by Applicable Rules, including, for example: (i) critical accounting policies and practices; (ii) liquidity; (iii) special purpose entities and off-balance sheet transactions; and (iv) related person transactions.

Review the following matters related to the Company's financial reporting process: (i) whether there were any significant financial reporting issues discussed during the period and, if so, how they were resolved and whether a second opinion was sought; (ii) major issues regarding accounting principles and financial statement presentations; (iii) the nature of any material correcting adjustments identified by the External Auditor; (iv) the use of pro-forma figures in any SEC filings or other public disclosure, release, or pre-release; (v) the methods used to account for significant unusual transactions; (vi) the substance of any significant litigation, contingencies or claims that had, or may have, a significant impact on the financial statements; (vii) reports from the External Auditor regarding alternative treatments of financial information within generally accepted accounting principles that the External Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the External Auditor; (viii) adjusting non-GAAP entries; (ix) the effect of regulatory and accounting initiatives as well as off-balance-sheet structures on the financial statements of the Company; (x) integrity of the external and internal financial reporting process; and (xi) the effect of regulatory and accounting initiatives on the Company's financial statements.

Take the following actions regarding legal and regulatory compliance: (i) review and discuss the effect of regulatory and

32

accounting initiatives with management and the External Auditor; and (ii) review and discuss the Company's compliance with legal and regulatory requirements that could have a significant impact on the Company's financial statements with management and the External Auditor.

At least annually, discuss with management, including the risk owners, processes and policies with respect to management, strategy, governance and incident management of the Company's principal risk exposures, including those in cybersecurity. This should include the processes management employs to identify, monitor and control its most significant exposures.

Oversee management's arrangement for the prevention and deterrence of fraud.

Ensure that appropriate action is taken against known fraud perpetrators.

99.    Under the "Oversight of Internal Controls" section of the Audit Charter, the Audit

Committee is responsible for the following:

Review and discuss with management and the External Auditor the assessment of the effectiveness of the Company's internal control over financial reporting and the report on internal control over financial reporting made by management and the attestation report of the External Auditor on the Company's internal control over financial reporting, in each case as required by Applicable Rules.

Review at least annually steps adopted to address any material control deficiencies and significant internal control recommendations identified through the internal or external audit process and ensure that appropriate corrective actions are instituted.

Establish and oversee procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing matters, or other compliance matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding accounting or auditing matters.

Consider the risk of management's ability to override the Company's internal controls.

33

Receive reports on matters of significance arising from work performed by other providers of internal control assurance to senior management and the Board.

100.     Under the "General Compliance and Oversight" section of the Audit Charter, the

Audit Committee is responsible for the following:

Meet separately with management, the Chief Internal Auditor, and the External Auditor periodically.

Report to the Board and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualifications, performance, and independence of the External Auditor, or the performance of the internal audit function.

Establish such other rules and operating procedures in order to fulfill its obligations under this Charter and Applicable Rules as and when the Committee deems necessary or appropriate.

Review, no less frequently than quarterly, with the Chief Executive Officer and the Chief Financial Officer the Company's disclosure controls and procedures and management's conclusions about the adequacy of such disclosure controls and procedures.

Receive and review reports from the Chief Ethics Officer and/or General Counsel/Chief Compliance Officer at least annually regarding the Company's compliance program.

Oversee, in consultation with the Governance Committee, the implementation of and compliance with the Company's Code of Business Conduct and Ethics (the "Code of Conduct").

Review with the Company's legal counsel any legal, compliance, and regulatory matters that could have a significant impact on the Company's financial statements.

Receive and review reports from the Chief Ethics Officer and/or General Counsel/Chief Compliance Officer at least quarterly regarding those ethics and compliance incidents reported during the applicable period, whether pursuant to the Code of Conduct, Company policies, or otherwise, that involve accounting, auditing, or financial reporting, as well as the status of any such ethics and

compliance incidents that were reported but not resolved during a prior period.

Receive, in consultation with the Governance Committee, reports from the Chief Ethics Officer and/or General Counsel/Chief Compliance Officer regarding, and promptly review, any ethics and compliance incident reported, whether pursuant to the Code of Conduct, Company policies, or otherwise, that constitutes an illegal act or violation of ethics policy by a member of the Board or an executive officer of the Company.

At least annually, the Chairperson of the Committee shall meet with the Chairperson of the Governance Committee to discuss those ethics and compliance incidents reviewed by each such committee during the applicable period, as well as the status of any such ethics and compliance incidents reviewed, but not resolved by, each such committee during a prior period.

Perform any other activities consistent with this Charter, the Company's bylaws, and governing laws that the Board or the Committee determines are necessary or appropriate.

101. While the Audit Committee had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, its members failed to fulfill these responsibilities.

**The False and Misleading Proxy Statements**

102. In addition to the above false and misleading statements that Defendants issued and/or caused to be issued, they caused the Company to file with the SEC false and misleading proxy statements on December 15, 2021, December 14, 2022, and December 13, 2023. The 2021 Proxy, 2022 Proxy, and 2023 Proxy are collectively referred to herein as the "**Proxies**."[4]

103. On December 15, 2021, Scotts filed the 2021 Proxy, soliciting shareholder approval for, *inter alia*, the re-election of Defendants Evans, Hanft, Johnson, and Littlefield, to serve a three-

---

[4] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

year term until the 2025 annual meeting. It also recommended that shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2021 fiscal year.

104. On December 14, 2022, Scotts filed the 2022 Proxy, soliciting shareholder approval for, *inter alia*, the re-election of Defendants Hagedorn Senior, Mistretta, and Volas, and Non-Party Aviles, to serve a three-year term until the 2026 annual meeting. It also recommended that shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 fiscal year.

105. On December 13, 2023, Scotts filed the 2023 Proxy, soliciting shareholder approval for, *inter alia*, the re-election of Defendants Kelly, Sandoval, Shumlin, and Vines, to serve a three-year term until the 2027 annual meeting. It also recommended that shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 fiscal year.

106. The 2021 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> It is management's responsibility to develop and implement the Company's strategic plans and to identify, evaluate, manage and mitigate the risks inherent in those plans. It is the Board's responsibility to oversee the Company's strategic plans and to ensure that management is taking appropriate action to identify, evaluate, manage and mitigate the associated risks. The Board administers its risk oversight responsibilities both through active review and discussion of enterprise-wide risks and by delegating certain risk oversight responsibilities to Board committees for further consideration and evaluation. The decision to administer the Board's oversight responsibilities in this manner significantly impacts the Board's leadership and committee structure.
>
> Because the roles of Chairman of the Board and CEO are combined, the directors annually elect a Lead Independent Director to enhance oversight of management and the potential risks facing the

Company. In addition, the Board is comprised of predominantly independent directors and all members of the Board's key committees — the Audit Committee, the Compensation Committee, and the Governance Committee — are independent. The checks and balances provided by our leadership structure help to ensure that key decisions made by the Company's senior management, up to and including the CEO, are reviewed and overseen by independent directors of the Board.

In some cases, risk oversight is addressed by the full Board as part of its engagement with the CEO and other members of senior management. For example, the full Board conducts a comprehensive annual review of the Company's overall strategic plan and the plans for each of the Company's business units, including associated risks. In connection with the Board's risk oversight responsibilities, management periodically provides the Board with reports regarding the significant risks facing the Company and how the Company is seeking to control or mitigate those risks. The Board also has responsibility for ensuring that the Company maintains appropriate succession plans for its senior officers and conducts an annual review of succession planning.

In other cases, the Board has delegated risk management oversight responsibilities to certain committees, each of which reports regularly to the full Board. For example, the Audit Committee oversees the Company's compliance with legal and regulatory requirements and its overall risk management process and has oversight responsibility for financial risks. As part of its oversight role, the Audit Committee regularly reviews risks relating to the Company's key accounting policies and receives reports regarding the Company's most significant internal controls and compliance risks from the Company's Chief Financial Officer as well as its internal auditors. Representatives of the Company's independent registered public accounting firm attend each Audit Committee meeting, regularly make presentations to the Audit Committee, and comment on management presentations. In addition, the Company's Chief Financial Officer and internal auditors, as well as representatives of the Company's independent registered public accounting firm, individually meet in private session with the Audit Committee on a regular basis, affording ample opportunity to raise any concerns with respect to the Company's risk management practices.

Likewise, the Compensation Committee oversees risks relating to the Company's compensation programs and practices. As discussed in more detail in the section captioned "Our Compensation Practices

— *Role of Outside Consultants*" within the Compensation Discussion and Analysis, the Compensation Committee employs an independent compensation consultant to assist it in reviewing the Company's compensation programs, including the potential risks created by and other impacts of these programs.

In addition, the Governance Committee oversees issues related to the Company's governance structure and other corporate governance matters and processes, as well as non-financial risks and compliance matters. The Governance Committee is also charged with overseeing compliance with the Company's Related Person Transaction Policy. The Governance Committee regularly reviews the Company's key corporate governance documents, including the Corporate Governance Guidelines, the Related Person Transaction Policy and the Insider Trading Policy, to ensure the documents continue to comply with the changing legal and regulatory environment and appropriately enable the Board to fulfill its oversight responsibilities.

107. The 2021 Proxy also stated the following regarding the Company's Code of Business Conduct and Ethics:

All employees of the Company and its subsidiaries, including each NEO, and all directors of the Company are required to comply with the Company's Code of Business Conduct and Ethics. The Sarbanes-Oxley Act of 2002 and the SEC Rules promulgated thereunder require companies to have procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters and to allow for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. The procedures for addressing these matters are set forth in the Company's Code of Business Conduct and Ethics.

In accordance with applicable NYSE Rules and SEC Rules, the Board has adopted The Scotts Miracle-Gro Company Code of Business Conduct and Ethics, which is available under the "Corporate Governance" link on the Company's website located at http://investor.scotts.com.

108. The 2022 Proxy and 2023 Proxy contained similar provisions to the 2021 Proxy regarding risk oversight, the Audit Committee's role in risk assessment and risk management, and the Company's Code of Business Conduct and Ethics.

109. Defendants Hagedorn Senior, Evans, Hanft, Johnson, Kelly, Littlefield, Sandoval, Shumlin, Vines, Mistretta, and Volas caused the Proxies to be false and misleading by failing to disclose that: (1) the risk oversight function of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the Proxies claimed the Company's Code applied to the Company's officers and directors, the Defendants violated the Code of Business Conduct and Ethics with no consequences.

110. Defendants Hagedorn Senior, Evans, Hanft, Johnson, Kelly, Littlefield, Sandoval, Shumlin, Vines, Mistretta, and Volas caused the Proxies to be false and misleading and failed to disclose material facts necessary to make the statement herein not false and misleading. Specifically, the Proxies failed to disclose, *inter alia*, that: (1) Scotts had an oversupply of inventory that far exceeded consumer demand prior to the start of the Relevant Period; (2) Defendants engaged in a channel-stuffing scheme to saturate the Company's sales channel with more product than those retailers could sell through to consumers; (3) Scotts was only able to satisfy its debt covenants through its channel-stuffing scheme; and (4) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111. As a result of the Company's false and misleading statement in the Proxies, the Company's stockholders made uninformed decisions when voting to reelect the Individual Defendants as proposed in the Proxies.

**ADDITIONAL BREACHES OF DUTIES**

112. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Scotts, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

113.     Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the Company's oversupply of inventory that far exceeded consumer demand prior to the start of the Relevant Period, and that Defendants engaged in a channel-stuffing scheme to saturate the Company's sales channel with more product than those retailers could sell through to consumers to satisfy its debt covenants as described herein. Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Scotts substantial damage.

114.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Scotts' public statements and internal control functions.

115.     Defendants, because of their positions of control and authority as officers and/or directors of Scotts, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. Defendants also failed to prevent other Defendants from taking such illegal actions. In addition, because of Defendants' improper course of conduct, the Company is now the subject of the Securities Class Actions, which alleges violations of federal securities laws. As a result, Scotts has expended, and will continue to expend, significant sums of money.

## DAMAGES TO SCOTTS

116.     As a direct and proximate result of Defendants' conduct, Scotts has expended and will continue to expend significant sums of money, including, but not limited to legal fees

associated with the aforementioned Securities Class Actions of amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

117. As a direct result of the Individual Defendants' conduct, Scotts has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118. Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

119. Plaintiff brings this action derivatively and for the benefit of Scotts to redress injuries suffered, and to be suffered, because of Defendants' breaches of their fiduciary duties as directors and/or officers of Scotts, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

120. Scotts is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121. Plaintiff is, and has been continuously at all relevant times, a stockholder of Scotts. Plaintiff will adequately and fairly represent the interests of Scotts in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

122. A pre-suit demand on the Board of Scotts is futile and, therefore, excused. At the time of filing this action, the Board consists of Defendants: (i) Hagedorn Senior, (ii) Evans, (iii) Hanft, (iv) Johnson, (v) Kelly, (vi) Littlefield, (vii) Sandoval, (viii) Shumlin, (ix) Vines, and Non-

Parties (x) Aviles, and (xi) Kingdon (the "**Demand Board**"). Plaintiff needs only to allege demand futility as to a majority of the Demand Board (*i.e.,* six directors).

123.     Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Demand Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

124.     In complete abdication of their fiduciary duties, the Demand Board either knowingly or recklessly participated in making and/or causing the Company to make materially false and misleading statements regarding the Company's oversupply of inventory that far exceeded consumer demand prior to the start of the Relevant Period, and that the Defendants engaged in a channel-stuffing scheme to saturate the Company's sales channel with more product than those retailers could sell through to consumers to satisfy its debt covenants as described herein. Specifically, the Demand Board knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospects from the public investing and supporting the artificially inflated price of Scotts' securities. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Demand Board breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile, and thus excused.

125.     The Demand Board, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

126.     Additionally, the Demand Board willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

**Additional Demand Futility Allegations**

127.     Demand is further excused as to Defendant Hagedorn Senior. Defendant Hagedorn Senior has served as the CEO of the Company since May 2001, Chairman of the Board since January 2003, and as President of the Company since October 2023. He has served as Company director since 1995 and was President from October 2015 until February 2016. As an employee of the Company, Defendant Hagedorn Senior derives substantially all of his income from his employment with the Company and is not independent. Accordingly, Defendant Hagedorn Senior could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis.

128.     As CEO, Defendant Hagedorn also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement, stating: "Mr. Hagedorn is not independent because he is the Company's CEO & President." As such, Defendant Hagedorn Senior could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Hagedorn is therefore futile.

129.     Defendant Hagedorn Senior is siblings with fellow board member and Vice Chair, Defendant Littlefield and a general partner of the Hagedorn Partnership, the Company's largest shareholder. Defendant Hagedorn Senior is also the father of Defendant Hagedorn Junior and the

son of Scotts' founder. These familial ties and clear allegiance to Scotts prevents Defendant Hagedorn Senior from providing unbiased and objective perspectives that are free from conflicts of interest. Thus, Defendant Hagedorn Senior cannot independently and disinterestedly consider a demand to sue his family.

130.    Moreover, as CEO, Defendant Hagedorn had the power and authority to control the contents of the Company's financial filings, press releases, and other market communications. He attested to being involved in the preparation and delivery of the Company's SEC filings alleged herein to be misleading and had the ability to have them corrected and/or prevent their release. Defendant Hagedorn Senior knew or recklessly disregarded the adverse facts regarding the Company's oversupply of inventory that far exceeded consumer demand prior to the start of the Relevant Period, and that the Defendants engaged in a channel-stuffing scheme to saturate the Company's sales channel with more product than those retailers could sell through to consumers to satisfy its debt covenants as described herein. During the Relevant Period, while the Company's stock price was artificially inflated before the truth was revealed, Defendant Hagedorn Senior sold over 348,000 shares of Company common stock worth over $42 million on MNPI. Through the Hagedorn Partnership during the Relevant Period, Defendant Hagedorn Senior sold approximately 103,000 shares of Company common stock, worth over $7.6 million on MNPI. Furthermore, Defendant Hagedorn Senior is also a defendant in the Securities Class Actions.

131.    Defendant Evans has served as a Company director at all relevant times hereto. As a director, Defendant Evans was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries,

44

and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Evans failed to fulfill these duties by permitting false and misleading statements to be made and not correcting those statements.

132. As a trusted Company director, Defendant Evans conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

133. Defendant Evans also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Evans is required to provide "oversight of (i) the integrity of the Company's financial statements and financial reporting process, [and] (ii) the Company's compliance with legal and regulatory requirements." Despite this, Defendant Evans failed to fulfill these additional duties by allowing these false and misleading statements to be made and also by not correcting them. Therefore, Defendant Evans faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

134. Furthermore, in his interim executive role, and in his role as a director, Defendant Evans reviewed, approved, signed, and otherwise personally made the false and misleading statements alleged herein through SEC filings, earnings calls, and other public forums. Thus, Defendant Evans faces a substantial likelihood of liability therefore and cannot reasonably consider a demand to sue.

135. Demand is further excused as to Defendant Hanft. Defendant Hanft has served as a Company director since 2010. He also serves as a member of both the Finance and Innovation and Technology Committees. The Company's 2023 Proxy admits that Defendant Hanft "is not

independent because he has received consulting compensation from the Company within the last three years that exceeds the applicable threshold for determining whether a director can be considered independent." Thus, demand is excused as to Defendant Hanft.

136. The Company provides Defendant Hanft with significant compensation for his role as stated above. As such, Defendant Hanft cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Hanft render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Hanft breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Hanft is futile and excused.

137. Demand is further excused as to Defendant Johnson. Defendant has served as a Company director since 2010. He is Chair of the Nominating and Governance Committee and is a member of both the Compensation and Organization Committee and the Innovation and Technology Committee. The Company provides Defendant Johnson with significant compensation for his role as stated above. As such, Defendant Johnson cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Johnson render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent

the scheme that caused the Company to make false and misleading statements. Thus, demand upon Defendant Johnson is futile and excused.

138.    Demand is further excused as to Defendant Kelly. Defendant Kelly has served as a Company director since 2006. Defendant Kelly is Chair of the Innovation and Technology Committee and is a member of both the Compensation and Organization Committee and the Finance Committee. The Company provides Defendant Kelly with significant compensation for his role as stated above. As such, Defendant Kelly cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Kelly render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Kelly breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Kelly is futile and excused.

139.    Demand is further excused as to Defendant Littlefield. Defendant Littlefield has served as a Company director since 2000 and Vice Chair since 2013. She also serves as Chair of the Finance Committee and is a member of the Innovation and Technology Committee. Defendant Littlefield is siblings with Chairman and Defendant Hagedorn Senior, the aunt of Defendant Hagedorn Junior, daughter of Scotts' founder, and is a general partner of the Hagedorn Partnership, the Company's largest shareholder. These family ties and the obvious allegiance to Scotts prevents Defendant Littlefield from providing unbiased and objective perspectives that are free from

47

conflicts of interest. Thus, Defendant Littlefield cannot independently and disinterestedly consider a demand to sue her family.

140.    The Company also states in its 2023 Proxy that Defendant Littlefield "is not independent because she is the sister of Mr. Hagedorn." Thus, demand is excused as to Defendant Littlefield. The Company provides Defendant Littlefield with significant compensation for her role as stated above. As such, Defendant Littlefield cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Littlefield render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. During the Relevant Period, through the Hagedorn Partnership Defendant Littlefield sold approximately 103,000 shares of Company common stock, worth over $7.6 million on MNPI. As a result, Defendant Littlefield breached her fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Littlefield is futile and excused.

141.    Demand is further excused as to Defendant Sandoval. Defendant Sandoval has served as a Company director since June 2022. He also serves as the Chair of the Compensation and Organization Committee and is a member of the Nominating and Governance Committee. The Company provides Defendant Sandoval with significant compensation for his role as stated above. As such, Defendant Sandoval cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Sandoval render him

incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Sandoval breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Sandoval is futile and excused.

142. Demand is further excused as to Defendant Shumlin. Defendant Shumlin has served as a Company director since 2017. He also serves as a member of the Compensation and Organization Committee and the Nominating and Governance Committee. The Company provides Defendant Shumlin with significant compensation for his role as stated above. As such, Defendant Shumlin cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Shumlin render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Shumlin breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Sandoval is futile and excused.

143. Demand is further excused as to Defendant Vines. Defendant Vines has served as a Company director since 2013. He also serves as a member of the Nominating and Governance Committee and is a member of the Innovation and Technology Committee. The Company provides Defendant Vines with significant compensation for his role as stated above. As such, Defendant

Vines cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Vines render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Vines breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Vines is futile and excused.

144.    Furthermore, Defendants Evans, Mistretta and Volas served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of Scotts' financial statements. Specifically, the Audit Charter provides that the Audit Committee is responsible for:

> [A]ssisting the Board in the oversight of (i) the integrity of the Company's financial statements and financial reporting process, (ii) the Company's compliance with legal and regulatory requirements (collectively, "Applicable Rules"), (iii) the qualification, independence and performance of the Company's independent registered public accounting firm (the "External Auditor"), (iv) the performance of the Company's internal audit function, and (v) the performance of other Committee functions as set forth in this charter.

145.    In their capacities as Audit Committee members, Defendants Evans, Mistretta and Volas reviewed and approved the materially misleading statements and allowed them to be disseminated in Scotts' SEC filings and other disclosures. Thus, Defendants Evans, Mistretta and Volas breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

## FIRST CLAIM

### Against All Defendants
*for Violations of Section 14(a) of the Exchange Act*

146.　Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.　Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

148.　Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

149.　The Proxies also stated that the Company's directors and employees are subject to the Company's Code of Conduct. The Proxies were also false and misleading because, despite assertions to the contrary, Scotts' compliance with its respective codes of conduct were not followed, as Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

150.　In the exercise of reasonable care, Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the

Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

151. The false and misleading elements of the annual Proxies led to the re-elections of several Defendants, allowing them to continue breaching their fiduciary duties to Scotts.

152. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxies.

153. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## SECOND CLAIM

**Against All Defendants**
*for Violations of Section 20(a) of the Exchange Act*

154. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155. Defendants, by virtue of their positions with Scotts and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Scotts and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. Defendants had the power and influence, and exercised same, to cause Scotts to engage in the illegal conduct and practices complained of herein.

156. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## THIRD CLAIM

**Against All Defendants**
*for Breach of Fiduciary Duties*

157. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.     Each Defendant owed to the Company the duties of candor, good faith, and loyalty in the management and administration of Scotts' business and affairs as directors and/or officers of the Company.

159.     Each of the Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

160.     Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly and recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

161.     Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

162.     Defendants engaged in a sustained and a systemic failure to properly exercise their fiduciary duties. Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's interests.

163. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Scotts has sustained and continues to sustain significant damages.

164. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

### FOURTH CLAIM

**Against All Defendants**
*for Unjust Enrichment*

165. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense and to the detriment of Scotts.

167. Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Scotts tied to the performance or artificially inflated valuation of Scotts, or received compensation that was unjust in light of Defendants' bad faith conduct.

168. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

### FIFTH CLAIM

**Against Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson**
*for Insider Trading*

169. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170. Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson owed the Company duties of loyalty, good faith, and care as officers and directors of the Company. This includes the duty not to trade, or allow others to trade, in the Company's stock on the basis of MNPI. Nevertheless, Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson

traded in the Company's stock while in possession of MNPI described herein, reaping proceeds of over $50 million.

171.     As alleged above, Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson were Scotts fiduciaries, possessed MNPI from Scotts, and traded in Scotts stock while in possession of such information. These defendants directed their stock sales set forth above due in whole or in part to their knowledge of the substance of the MNPI that they possessed. These defendants breached their duty of loyalty by selling or directing the sale of Scotts stock on the basis of the knowledge of MNPI described above before that information was revealed to the Company's stockholders.

172.     Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson knew that the investing public was unaware of MNPI concerning Scotts financial practices when they sold their Scotts stock. They also knew that, if the information were disclosed, the market price of Scotts stock would be significantly lower. These defendants timed their stock sales to take advantage of the public's ignorance of the concealed facts described herein and obtain a higher price for the stock they sold, thus benefiting by misappropriating the Company's confidential information.

173.     As a direct and proximate result of the misconduct of Defendants Hagedorn Senior, Littlefield, Hagedorn Junior, and Johnson, Scotts has sustained significant damages, as alleged herein.

174.     Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## PRAYER FOR RELIEF

175.     **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Scotts, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to Scotts;

C.     Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

D.     Finding that Defendants have been unjustly enriched;

E.     Determining and awarding to Scotts the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

F.     Directing Scotts and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Scotts and its stockholders from a repeat of the damaging events described herein;

G.     Awarding Scotts restitution from Individual Defendants;

H.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.     Granting such other and further relief as the Court may deem just and proper.

Dated: November 19, 2024

Respectfully submitted,

**EMPLOYMENT LAW PARTNERS, LLC**

*/s/ Stuart G. Torch*
Stuart G. Torch (0079667)
David N. Truman (0082347)

56

4700 Rockside Road, Suite 530
Independence, Ohio 44131
Telephone: (216) 382-2500
Fax: (216) 381-0250
stuart@employmentlawpartners.com
david@employmentlawpartners.com

*Local Counsel for Plaintiff*

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
Sidharth Kakkar (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: 212.363.7500
Email: gnespole@zlk.com
        dtepper@zlk.com
        csuk@zlk.com
        skakkar@zlk.com

*Lead Counsel for Plaintiff*

## Jury Demand

Plaintiff hereby demands a trial by jury.

*/s/ Stuart G. Torch*
Stuart G. Torch (0079667)

*One of the attorneys for Plaintiff*